# IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## Bid Protest

| | |
|---|---|
| **VICTORY PROCUREMENT SERVICES, LLC,** ) ) ) | |
| Plaintiff, ) ) | |
| v. ) ) | **No. 15-524C** |
| **UNITED STATES OF AMERICA,** ) ) | **Judge Wheeler** |
| Defendant, ) ) | |
| and ) ) | **REDACTED VERSION** |
| **CULMEN INTERNATIONAL, LLC,** ) ) | |
| Intervenor - Defendant. ) | |

**REPLY IN SUPPORT OF PLAINTIFF VICTORY PROCUREMENT SERVICES, LLC'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND RESPONSE TO CROSS-MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND MOTION TO DISMISS**

Dated: July 31, 2015

Jon D. Levin
W. Brad English
J. Andrew Watson, III
Matthew Moore
MAYNARD, COOPER & GALE, P.C.
655 Gallatin Street
Huntsville, Alabama 35801
Telephone: (256) 551-0171
Fax: (256) 512-0119
*Counsel for Victory Procurement Services, LLC*

**TABLE OF CONTENTS**

I. INTRODUCTION ..................................................................................................................1

II. VPS'S PROTEST IS TIMELY ............................................................................................2

III. THE SOLICITATION COMPELLED THE AGENCY TO EVALUATE
CULMEN'S ABILITY TO MEET REQUIREMENTS .......................................................5

IV. CULMEN'S PROPOSAL DID NOT MEET THE SOLICITATION
REQUIREMENTS ................................................................................................................8

V. THE ADDITIONAL INFORMATION IN THE AGENCY'S POSSESSION
DEMONSTRATED CULMEN'S TECHNICAL UNACCEPTABILITY ........................11

    A. The Agency's Market Research ............................................................................11

    B. Culmen's Technical Document #1 ........................................................................12

    C. VPS's Proposal .....................................................................................................13

VI. CONCLUSION ..................................................................................................................14

CERTIFICATE OF SERVICE ....................................................................................................16

i

# TABLE OF AUTHORITIES

**Cases:**

Allied Tech. Grp., Inc.  v. United States,
    649 F.3d 1320 (Fed. Cir. 2011) ........................................................................................ 8

Blue and Gold Fleet, L.P. v. United States,
    492 F.3d 1308 (Fed. Cir. 2007) .................................................................................... 2, 4

Caddell Constr. Co., Inc. v. United States,
    111 Fed. Cl. 49 (2013) ................................................................................................ 2, 3, 4

CliniComp Int'l, Inc. v. United States,
    117 Fed. Cl. 722 (2014) ............................................................................................... 8, 9

CW Gov't Travel, Inc. v. United States,
    110 Fed. Cl. 462 (2013) ............................................................................................... 8, 9

Guardian Moving & Storage Co., Inc. v. United States,
    2015 WL4162395 at *18 (Fed. Cl. July 10, 2015) ....................................................... 8, 9

Int'l Res. Recovery v. United States,
    60 Fed. Cl. 6 (2004) .......................................................................................................... 5

L-3 Commc'ns EOTech, Inc. v. United States,
    83 Fed. Cl. 643 (2008) ................................................................................................. 8, 9

Outsourcing Servs., LLC v. United States,
    69 Fed. Cl. 40 (2005) ....................................................................................................... 9

PGBA, LLC v. United States,
    60 Fed. Cl. 196 (2004) .................................................................................................. 8-9

Red River Holdings, LLC v. United States,
    87 Fed. Cl. 768 (2009) ................................................................................................ 5, 9

TLT Constr. Corp. v. United States,
    50 Fed. Cl. 212 (2001) ................................................................................................ 8, 9

**Regulations:**

48 C.F.R. § 15.210 .................................................................................................................... 6

Pursuant to this Court's Order of May 26, 2015 and Rule 52.1, RCFC, Plaintiff VPS replies in support of its previously-filed Motion for Judgment on the Administrative Record (ECF Doc. No. 29) ("VPS's MJAR").[1]  VPS also responds in opposition to the Agency's and Culmen's Cross-Motions for Judgment on the Administrative Record (the "Cross Motion" or "Cross Motions") and the Agency's Motion to Dismiss (ECF Doc. Nos. 32 and 33) (the "Motion to Dismiss").  VPS shows the Court as follows:

I.      **INTRODUCTION.**

Rather than address VPS's arguments, the Cross-Motion attempts to distract the Court by picking a fight with straw men.  But this protest should not be resolved on the basis of the arguments that that the Agency attributes to VPS, but rather the arguments that VPS has actually asserted.  In the interest of clarity, VPS's arguments are briefly described below:

- The Agency challenges the timeliness of VPS's protest, contending that VPS was required to protest prior to award.  The Agency apparently interprets VPS's argument to be that it was the only source of any P18MH2 article.  The Agency is incorrect.  There is only one manufacturer of the P18MH2, but this does not mean that the manufacturer has no prior sales or that current owners are not willing to part with their product.  The Agency relies on the existence of that after-market as support for the purported reasonableness of its evaluation.  The undisputed existence of the after-market demonstrates that a pre-award protest was unwarranted, as the GAO correctly found.  This Court should reach a similar conclusion.

- The Agency fails to recognize that the P18MH2 is not a general description of the article required by the Contract, but is the specific description of the product manufactured by Arzenal and Mil-Exim.  The Agency knows that Culmen cannot obtain a new P18MH2, meaning that it will have to either provide an after-market article, or a variant.  Given the Agency's stated refusal to accept a variant, it was

---

[1] In the interest of brevity, VPS will continue to use the same defined terms and phrases from the VPS MJAR.  (See ECF Doc. No. 29.)

1

Case 1:15-cv-00524-TCW Document 36 Filed 07/31/15 Page 6 of 20

- incumbent upon the Agency to determine exactly how Culmen intended to meet the Agency's requirement. The Agency's failure to do so was unreasonable.

- VPS does not, as the Agency repeatedly asserts, contend that the Agency is bound by its exclusivity agreement with Arzenal and Mil-Exim (the "Exclusivity Agreement"). (AR 291, 307.) VPS does assert, however, that the Agency is bound by law to evaluate proposals in a reasonable fashion. To meet that burden, the Agency must recognize the existence of the Exclusivity Agreement and its potential impact on this procurement. Its failure to do so was unreasonable.

- VPS recognizes that the Contract was to be awarded on an LPTA basis. But the Agency is not excused from evaluating the technical acceptability of proposals simply because the award was to be made to the low-price offeror. VPS draws comparisons between its proposal and Culmen's, not to lobby for a best-value analysis, but to show that Culmen's proposal falls woefully short of demonstrating its ability to meet the Agency's requirement. The Agency's selection of Culmen's deficient proposal was unreasonable.

Even under the exceedingly low standard that the Agency and Culmen incorrectly advance as appropriate for review of this protest, Culmen's proposal fails to show that it is "clearly" capable of meeting the Solicitation requirements. Accordingly, the Court should grant VPS's MJAR.

## II. VPS'S PROTEST IS TIMELY.

Pursuant to Blue and Gold Fleet, L.P. v. United States, challenges to the terms of a solicitation must be raised prior to the close of the bidding process or they are waived. 492 F.3d 1308, 1313 (Fed. Cir. 2007). This waiver does not, however, extend to challenges based on alleged errors in agency evaluations. Caddell Constr. Co., Inc. v. United States, 111 Fed. Cl. 49, 74 (2013). The Agency challenges the timeliness of VPS's protest, just as it did at GAO. And just as GAO denied the Agency's motion, so should the Court.

VPS's protest is not based upon the Agency's decision to compete this procurement; rather, VPS challenges the Agency's evaluation of proposals as part of that competition. Specifically, VPS protests the Agency's conclusion that Culmen was technically acceptable. (ECF Doc. No. 1 at ¶¶ 35-43; ECF Doc. No. 29 at 12-15.)

The Solicitation contained two alternate requirements for a P18MH2 - - "new" and "renovated like-new." (AR 112.) Neither of these terms is unclear. While Mil-Exim and Arzenal have granted VPS the exclusive right to sell their products in the United States, VPS's rights under the Exclusivity Agreement do not extend to "renovated like new" products sold on the secondary market. Any protest of the terms of the Solicitation would have failed because VPS possesses no exclusive right to sell "renovated like new" products. Indeed, the Agency relies heavily upon that precise distinction in its substantive argument. (Compare ECF Doc. No. 33 at 24-25 with ECF Doc. No. 33 at 37-44.) Because the Exclusivity Agreement does not prevent other offerors from obtaining a "renovated like new" product, VPS had no reason to challenge the terms of the Solicitation. The Agency's duplicitous argument should therefore be rejected.

Similarly, a challenge to an agency's evaluation will not be converted into a challenge to the terms of a solicitation merely because information publicly available at the time of the solicitation would have revealed part of the protestor's basis for challenging the evaluation. Caddell Constr. Co. Inc., 111 Fed. Cl. at 74. As the Court of Federal Claims held in Caddell Constr. Co. Inc., VPS's suspicion that there is little or no after-market for P18MH2s does not form the basis for dismissing this protest. In Caddell Constr. Co. Inc., the solicitation was divided into two phases, a pre-qualification phase, and a request for proposals. 111 Fed. Cl. at

53. The Pre-qualification Notice advised offerors that U.S. firms would receive a 10% price preference pursuant to the Percy Amendment. Id. at 55. In making its pre-qualification decisions, the government initially gave the awardee a failing evaluation and determined that it did not qualify for the Percy Amendment price preference, but subsequently reversed both decisions prior to publishing the list of pre-qualified offerors. The government published list of pre-qualified offerors designated the awardee as a "U.S. firm," but publicly available information indicated the awardee was not, in fact, a U.S. firm. Id. at 59-61.

After the government awarded the contract to awardee, the protestor challenged (i) the government's decision to pre-qualify the awardee, (ii) the government's application of the Percy Amendment price preference to awardee, and (iii) the award of the contract. Caddell Constr. Co. Inc., 111 Fed. Cl. at at 71. The awardee argued that the protest was untimely because the protestor should have known of its basis for protest at the time the list of pre-qualified offerors was published - - including the awardee. Id. at 73. The court, however, declined to extend the Blue and Gold waiver to the facts in Caddell Constr. Co. Inc. because the protestor was challenging the government's evaluation rather than the terms of the solicitation. Id. at 76. While publicly available information would have put the protestor on notice that the awardee was pre-qualified and given a pricing preference despite its non-U.S. firm status, those facts were not at issue in the protest. Rather, the protester's challenge was directed to the government's evaluation that led to the awardee's pre-qualification and pricing preference in the first place. Id. at 76-77.

Similar to Caddell Constr. Co. Inc., VPS does not allege that the Solicitation was erroneous or that the award to Culmen, in and of itself, was erroneous. ***Rather, VPS's position***

4

*is that the Agency's award was improper because, contrary to the terms of the Solicitation, the Agency blindly accepted Culmen's naked promise that it would provide properly-upgraded radar systems, without ascertaining how Culmen intended to upgrade the base radar systems*. Accordingly, the Agency's request for dismissal must be denied.

### III. THE SOLICITATION COMPELLED THE AGENCY TO EVALUATE CULMEN'S ABILITY TO MEET REQUIREMENTS.

It is a fundamental tenet of procurement law that proposals must be evaluated in accordance with the terms of the solicitation. Red River Holdings, LLC v. United States, 87 Fed. Cl. 768, 786 (2009). The reciprocal rule is that "[p]roposals must be complete and conform to the solicitation." Id. at 787. "[I]t is well established that all offerors . . . are expected to demonstrate their capabilities in their proposals." Int'l Res. Recovery, Inc. v. United States, 60 Fed. Cl. 1, 6 (2004). The Court of Federal Claims' decision in Red River is instructive.

In Red River, as here, the evaluation criteria were tied to the statement of work. Id. at 775. Therefore, the court recognized that offerors were required to address those requirements in their proposals. Id. In considering the protest, the court found that the awardee failed to address several of the requirements set forth in the subject solicitation's Section M and statement of work. Id. at 788. Based on that determination, the court concluded that the agency's award was arbitrary, capricious, and lacked a rational basis. Id. at 788-89.

Here, as in Red River, the Agency clearly linked its technical evaluation to the SOW. Section M-1 "Evaluation Factors for Award" set forth the following standards for determining technical acceptability:

5

>Technically Acceptable- Proposal *clearly meets the minimum requirements of the Statement of Work*.

>Technically Unacceptable- Proposal *does not clearly meet the minimum requirements of the Statement of Work*.

(AR 151 (emphasis added).) Accordingly, the Agency stated its intent to evaluate offerors' compliance with the minimum requirements of the SOW.

Similarly, Section L states that "[a]ll offerors shall explicitely (*sic*) state/show that their quote (*sic*) meets the requirements specified in the schedule." (AR at 150.) The Agency opted to issue the Solicitation using Standard Form 33, which defines "the schedule" as all of Sections A through H of the Solicitation. (AR at 107.) See also 48 C.F.R. § 15.210 (stating "[p]rescribed forms are not required to prepare solicitations described in this part.") Solicitation Section C contained the SOW. (AR at 112-118.) Thus, the Agency required offerors to submit a proposal that demonstrated their ability to meet all of the SOW's requirements.

The Agency chose to deem almost everything in the SOW a requirement, entitling SOW Section 3, "REQUIREMENTS/SPECIFICATIONS." (AR at 112-117) (emphasis in original).) The very first of the Agency's requirements /specifications was:

>3.1  The contractor *shall provide*:

>3.1.1  Two (2) newly manufactured or renovated P18MH2 vehicles (one (1) Radar equipment vehicle and one (1) antenna vehicle). The vehicles *shall be complete and fully operational*. Complete and fully operational for the purposes of this contract is defined as the vehicles delivered *shall come equipped with all equipment and kit(s) that are integral to the vehicles' operating condition*.

6

>       3.1.1.1    The vehicles *shall only reflect the manufacturer's latest authentic specifications and features*, and the *contractor shall ensure the P18MH2 vehicles perform in accordance with the manufacturer's latest specifications and technical documentation*.
>
>       3.1.1.2    All major subsystems of the P18MH2 *shall be fully operational and free from defects*. . ..

(AR 112 (emphasis added).)

Based on this language, Culmen and VPS were *required* to "*clearly*" demonstrate an ability to "provide. . . [t]wo (2) newly manufactured or renovated P18MH2 vehicles." (AR 112, 151.) Culmen and VPS were further required to "*clearly*" demonstrate that the vehicles are "complete and fully operational" meaning that they "come equipped with all equipment and kit(s) that are integral to the vehicles' operating condition." (Id.) Finally, Culmen and VPS were required to "*clearly*" demonstrate that the P18MH2 vehicles they provided "reflect the manufacturer's latest authentic specifications and features, and. . . perform in accordance with the manufacturer's latest specifications and technical documentation." (Id.) These requirements are absolutely consistent with ███████████████████████████████████████

███████████████████████████████████████

(AR 49, 201.)

The Agency attempts to portray these requirements as something other than "requirements." Specifically, the Agency tries to distinguish between "requirements" and "performance criteria." (ECF Doc. No. 33 at 34.) However, the Agency does not explain exactly how it has determined that the "requirements" are not actually "requirements." And the Solicitation, which controls, provides no basis for such a distinction. As discussed above, the

7

controlling, plain language of the Solicitation made clear that nearly everything in the SOW was a "requirement."

Because Sections L and M incorporate all of the "requirements" by reference, Culmen and VPS were both required to "clearly meet" and "explicitly show" that their respective solutions met the various SOW requirements and specifications. (AR 112, 150-151.) VPS's proposal complied with that directive. Culmen's did not.

## IV. CULMEN'S PROPOSAL DID NOT MEET THE SOLICITATION REQUIREMENTS.

The Agency relies heavily on the Court of Federal Claim's recent decision in Guardian Moving & Storage Co., Inc. v. United States to support the propriety of its evaluation. No. 15-30C, 2015 WL 4162395, at *18 (Fed. Cl. July 10, 2015). In Guardian, the Court of Federal Claims stated that "where a proposal, on its face, should lead an agency to the conclusion that an offeror could not and would not comply with the applicable requirement" an agency *may not* rely on its representation of compliance. Id. (quoting Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1330-31 (Fed. Cir. 2011)) (internal emphasis omitted). But that is exactly what the Agency did in this instance. As such, Guardian is inapposite to the facts of this protest.

As set forth below, Culmen's proposal failed to address key Solicitation requirements, as revealed by a cursory review of the AR. The cases most akin to these facts, therefore, are those cited by VPS in its MJAR. (See CliniComp Int'l, Inc. v. United States, 117 Fed. Cl. 722, 741 (2014); CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. 462, 490 (2013) (quoting TLT Constr. Corp. v. United States, 50 Fed. Cl. 212, 216 (2001)); L-3 Commc'ns EOTech, Inc. v. United States, 83 Fed. Cl. 643, 653 (2008); PGBA, LLC v. United States, 60 Fed. Cl. 196, 207

8

(2004).) The foregoing authorities hold that: (1) offerors must explain how they will meet the requirements of the solicitation to be considered for award; and (2) blanket statements that the offeror will meet the technical requirements and promises to perform are insufficient to establish technical acceptability. See Red River 87 Fed. Cl. at 787 (citing Int'l Outsourcing, 69 Fed. Cl. at 49 n.9). The Court should therefore disregard Guardian and follow the holdings set forth in VPS's MJAR. (See CliniComp, 117 Fed. Cl. at 741 (2014); CW Gov't Travel, 110 Fed. Cl. at 490 (2013) (quoting TLT Constr. Corp., 50 Fed. Cl. at 216 (2001)); L-3 Commc'ns EOTech, 83 Fed. Cl. at 653 (2008); PGBA, 60 Fed. Cl. at 207 (2004).)

The Agency refers several times to the fact that Culmen's proposal was 28 pages long. (ECF Doc. No. 33 at 10, 33, 42.) Clearly, the Agency has equated activity with achievement. Despite the length, Culmen's statements regarding the upgrade can be boiled down to the following five points:

- Culmen intended to use ▓▓▓ as a point-of-contact for obtaining a P18MH2. (AR 172.)
- ▓▓▓ "has all base systems in their possession." (Id.)
- The base systems "will be upgraded." (Id.)
- The Execution Plan provides ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (AR 179.)
- The technical specifications Culmen provided ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (Compare AR 175-177 with ECF Doc. No. 29 Appendix A.)

The above is the sum total of Culmen's response to the several SOW requirements related to the upgrade. Culmen failed to address any of them in any detail. Culmen does not claim that ▓▓▓ is a manufacturer, but merely states that it possesses a base P18 system that will be

9

upgraded.[2] (AR 172.) Indeed, *Culmen does not even identify the manufacturer it intended to use*. To the extent Culmen references ▮ in any role at all, it is as a "supplier" rather than manufacturer. (AR 179.) Culmen declined to provide any further indication of ▮ role.[3]

The technical specifications provided by Culmen are similarly unenlightening. They merely ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Frankly, the Agency should have found the same information during the course of its own market research.[4] The specifications provided by Culmen contain so many questionable statements and references to ▮▮▮▮▮▮▮▮▮▮ that a rational reviewer should not have concluded them to be meaningful.

Culmen's proposal does not *"clearly" show* that: "the P18MH2s would reflect the manufacturer's latest authentic specifications and features;" "perform in accordance with the manufacturer's latest specifications and technical documentation;" or would be "complete and fully operational;" or how the P18MH2s would be "equipped with all equipment and kit(s) that are integral to the vehicles' operating condition." Culmen did not even try to make such a

---

[2] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[3] Culmen intones in its Technical Document #1 that it will not use ▮▮▮▮, but ▮▮. (AR 971.) Yet, Culmen and ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (Compare AR 175-177 and AR 975-980 <u>with</u> ECF Doc. No. 29 Appendix A.) One would assume that ▮▮ would supply copies of ▮▮▮▮▮▮▮▮▮▮▮▮ if it were a manufacturer, as the Agency insists may be the case. (ECF Doc. No. 33 at 40-41.) As ▮▮ itself suggests, however, it is merely a supplier of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and not a manufacturer. If, in that role, ▮▮ had indeed found an existing owner of a P18MH2 who wanted to sell its P18MH2 (e.g., because the existing owner had too much Soviet-era capital equipment in its inventory), one would assume that ▮▮ would disclose that information. Curiously, however, neither Culmen nor ▮▮ made any such disclosures.

[4] Counsel for VPS found this information simply by typing ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ into a search engine and finding only a single entry - - for Arzenal's website.

10

showing, stating instead, in purposefully-chosen passive voice, that the P18 base unit in its possession would be upgraded. These very SOW requirements were condition precedent to all other requirements. (AR 112-117.) Culmen's training, packaging, and shipping have no value if the article fails to arrive. Given the paucity of detail in Culmen's proposal, it is surprising that Agency evaluators at any level were able to conclude that Culmen "clearly [met] the minimum requirements of the Statement of Work." The Agency erred when it made that determination and VPS's protest should be sustained.

## V. THE ADDITIONAL INFORMATION IN THE AGENCY'S POSSESSION DEMONSTRATED CULMEN'S TECHNICAL UNACCEPTABILITY.

As VPS explained in its Complaint and MJAR, the P18MH2 is a Mil-Exim and Arzenal product, just as a Camry is a Toyota product and an iPhone is an Apple product. (ECF Doc. No. 1 ¶¶ 7-10; Doc. No. 29 at 2-3.) Similar products may exist, but they do not share the "P18MH2" moniker. Although Culmen's proposal merely waves its hand at the Agency's requirements, it should also have been clear to the Agency from the totality of the information contained in the AR that Culmen's solution did not "clearly meet the requirements of the SOW."

### A. The Agency's Market Research.

The Agency claims that its ▇▇▇▇▇▇▇ shows that a P18MH2 is produced in several countries. (ECF Doc. No. 33 at 40-41.) The AR shows no such thing. The AR contains a scant three responses. The first, VPS's response, contains several references to Hungary. (AR 77-87.) The ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. (AR 88.) ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

11

███████████████████████████████████████████████████████████

█████████████████ contains not a single usage of the term "P18MH2." Thus, the Agency's

████████████ demonstrates that the P18MH2 is manufactured only in Hungary and not, as the

Agency asserts, in multiple countries. Yet, that unsupported position is the one that the Agency

has chosen to take to justify its evaluation of this procurement.

      B.  <u>Culmen's Technical Document #1.</u>

VPS argued in its MJAR that the Agency erred in deeming Culmen technically

acceptable without first evaluating Culmen's unexplained switch from ██████ to ███ in

Technical Document #2. (ECF Doc. No. AR 150, 172.) In response, the Agency belatedly

provided a revised Technical Document #1 supplied by Culmen. (ECF Doc. No. 30.)

While Culmen's revised Technical Document #1 shows that Culmen informed the

Agency that it intended to use ████ as a supplier, it makes no mention of a manufacturer. In its

Technical Document #1, Culmen states that Arzenal has entered into an exclusive relationship

with another company. Culmen asserts that it has "found an alternate supplier in Hungary,

████." Culmen represented that ████ is not affiliated with Arzenal. (AR 973.) Culmen provided

no additional information regarding ████ or its qualifications. Culmen did not represent ████

expertise, whether it has a manufacturing background, or what companies it intended to work

with to refurbish and deliver a P18MH2. The document Culmen attached as █████

"SPECIFICATIONS" is █████████████████████████████████████████

████████████████████████████████████████████████ (<u>Compare</u> AR 975-

980 <u>with</u> ECF Doc. No. 29 Appendix A.) And, just like Culmen's Technical Document #2,

█████ SPECIFICATIONS contain no explanation for how it will convert the █████████

12

▇▇▇ to meet the Agency's requirements. (AR 975-980.) The Agency found the absence of information sufficient to determine Culmen to be technically acceptable.

      C. VPS's Proposal.

In contrast to Culmen's proposal, VPS's provided a detailed explanation that clearly demonstrated its ability to source a P18MH2 meeting the manufacturer's latest specifications. As VPS noted in its MJAR, it intended to purchase the P18MH2 directly from Mil-Exim and Arzenal. (AR 291.) VPS specifically represented that production of the system "***requires both A[r]zenal and Mil-Exim as Arzenal is the factory and Mil-Exim owns the technology***." (Id.) VPS explained the upgrade process from a P18 to a P18MH2 in detail. (AR 292, 295.) VPS also provided the Agency with a letter from Arzenal and Mil-Exim in Annex B of its proposal, confirming the existence of the Exclusivity Agreement, which grants VPS the exclusive right to sell the P18MH2 in the United States. (AR 307, 499-500.)

The Agency disregards these points, stating that VPS's letter of exclusivity is neither authenticated nor certified and then carefully dissects and attacks its language. (ECF Doc. No. 33 at 3, 15, 37.) It is ironic that the Agency is so willing to accept Culmen's promise to perform absent any detail whatsoever, but challenges the existence and meaning of the Exclusivity Agreement despite: (a) the letter from Arzenal and Mil-Exim; and (b) Culmen's representation to the Agency that the Exclusivity Agreement prevented it from obtaining a P18MH2 from Arzenal, as originally proposed. (AR 292, 499-500, 973.) Indeed, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ AR 972.) Despite its undeniable contrary knowledge, the Agency now pretends that the Exclusivity Agreement does not exist. Irony aside, the Agency's

13

arguments are misplaced. Failing to account for or consider the existence of the Exclusivity Agreement was, and remains, unreasonable.

In addition to Culmen's striking lack of responsiveness, the additional information in the AR demonstrates beyond doubt that the Agency had substantial data at its fingertips that casts doubt on Culmen's non-descript promise to perform. Yet, the Agency recognized none of it - - not the contracting officer, the technical evaluators, the SSEB that blindly relied on the technical evaluators, or the SSA, who claimed he so carefully reviewed the record before making his independent determination.[5] On this basis as well, therefore, VPS's protest is due to be sustained.

## VI.   CONCLUSION.

For the foregoing reasons, VPS's protest must be sustained, an injunction entered against the Agency, and judgment on the Administrative Record entered in favor of VPS.

Respectfully submitted,

/s/ Jon D. Levin
Jon D. Levin
W. Brad English
J. Andrew Watson, III
Matthew Moore

---

[5] The Agency writes for several pages that VPS attempts to turn this purchase into a best value procurement. VPS has never asserted that the Agency intended to or should have made a best value determination. VPS contends that Culmen's failure to meaningfully address the fundamental purpose of the procurement - - to buy a P18MH2 - - is so glaringly obvious that the SSA should have recognized it if he had reviewed the proposals as claimed. In either event, his decision to award a contract to Culmen is fatally flawed and should be overturned for all of the reasons set forth in VPS's MJAR and in this brief.

14

**OF COUNSEL:**

**MAYNARD, COOPER & GALE, P.C.**
655 Gallatin Street
Huntsville, Alabama 35801
Telephone: (256) 551-0171
Fax: (256) 512-0119
jlevin@maynardcooper.com
benglish@maynardcooper.com
awatson@maynardcooper.com
mmoore@maynardcooper.com

15

**CERTIFICATE OF SERVICE**

I hereby certify that I have caused a true and correct copy of the foregoing to be served via electronic filing with the Court's ECF System and/or by U.S. Mail on July 31, 2015, which will effect service upon the following:

Mariana Teresa Acevedo, Esquire
U.S. DEPARTMENT OF JUSTICE
Commercial Litigation Branch
8th Floor
1100 L St. NW
Washington, DC 20530
Mariana.Acevedo@usdoj.gov

Antonio R. Franco, Esquire
Patrick T. Rothwell, Esquire
PILIEROMAZZA PLLC
888 17th Street, NW, 11th Floor
Washington D.C. 20006
afranco@pilieromazza.com
prothwell@pilieromazza.com

/s/ Jon D. Levin
Jon D. Levin
*Of Counsel*

16